# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

In the Matter of an Anonymous Member of the South Carolina Bar, Respondent.

Appellate Case No. 2020-000478

Opinion No. 27974
Submitted May 8, 2020 – Filed May 27, 2020

## ADMONISHMENT

John S. Nichols, Disciplinary Counsel, and Sabrina C. Todd, Senior Assistant Disciplinary Counsel, both of Columbia, for the Office of Disciplinary Counsel.

William C. Wood, Jr., of Nelson Mullins Riley & Scarborough, LLP, of Columbia, for Respondent.

**PER CURIAM:**   In this attorney disciplinary matter, Respondent and the Office of Disciplinary Counsel (ODC) have entered into an Agreement for Discipline by Consent (the Agreement) pursuant to Rule 21, RLDE, Rule 413, SCACR.  In the Agreement, Respondent admits she failed to restrict access to South Carolina-based trust accounts containing client funds and ensure monthly reconciliations of those accounts were performed properly.  Respondent consents to the imposition of confidential admonition or a public reprimand.  An investigative panel of the Commission on Lawyer Conduct (the Commission) voted unanimously to recommend accepting the Agreement and further recommended a public reprimand, issued in an anonymous opinion, be imposed.

We agree with the spirit of the Commission's recommendation; however, the sanction of a public reprimand requires *publicly* identifying the name of the disciplined attorney.  In the instant matter, we find the imposition of a public reprimand identifying Respondent by name is not warranted based on Respondent's

prior responsible handling of client funds, her complete lack of knowledge regarding the criminal activities of other involved parties, and her continuous cooperation with ODC's investigation. Accordingly, we accept the Agreement and issue this anonymous admonition for the benefit of the Bar. The facts, as set forth in the Agreement, are as follows.

## Facts

### *Morris Hardwick Schneider*

Morris Hardwick Schneider (MHS) was a multi-jurisdictional real estate closing and default services law firm based in Atlanta, Georgia. In 2014, Nathan Hardwick was MHS's CEO and held a majority interest in the firm. Hardwick oversaw corporate accounting for MHS and financial and accounting matters for the closing side of the practice from his office in Atlanta. MHS's two other equity partners, Mark Wittstadt and Gerard Wittstadt, were based in Maryland and headed the firm's default services practice. None of MHS's equity partners were licensed to practice law in South Carolina.

Respondent began working for MHS in 2004. Respondent—who was licensed to practice law in South Carolina and Georgia—worked from one of MHS's Georgia offices and handled some South Carolina transactions. In 2013, Hardwick asked Respondent to open an MHS office in Columbia. MHS had an existing office in Greenville and previously had offices in other South Carolina cities. The Columbia office opened in early 2014. Respondent was the sole attorney in the Columbia office and held the title of "Senior Managing Attorney." Respondent took marketing direction from a South Carolina licensed attorney who was a non-equity partner at MHS and held the title of "President of South Carolina Operations." However, Respondent received no other formal supervision or training regarding trust accounting or other aspects of running the Columbia office.

MHS had five South Carolina IOLTA accounts, some of which were referred to as "the old and new SunTrust accounts." Respondent had signatory authority on all South Carolina accounts, but both the Columbia and Greenville offices used the old and new SunTrust accounts. MHS's President of South Carolina Operations was not a signatory on any of the South Carolina trust accounts, but numerous non-attorney accounting staff located outside of South Carolina and attorneys not licensed in South Carolina were signatories on the accounts.

As she had done when she was in Georgia, Respondent responsibly handled the receipt and disbursement of funds related to her real estate closings; she ensured that disbursements were made only after corresponding funds were deposited and that all funds were disbursed. Respondent personally authorized the release of outgoing wires and issued checks for her closings. Respondent also followed up on outstanding checks issued for the closings she handled. However, if money was wired into the wrong account by mistake, only the MHS accounting staff in Atlanta could correct the mistake by transferring funds from one account to another. Although Respondent had access to a bank portal to review and approve wires, she did not have access to bank records for all transactions. Respondent never saw the South Carolina trust accounts' bank statements or reconciliation reports. She could not generate a reconciliation report, and, although she could see ledgers for all individual South Carolina closings, she did not review, and does not know if she could access, firm ledgers. The MHS accounting staff in Atlanta reconciled the accounts and never advised Respondent of any problems with the accounts.

### *The NSF Report*

In May 2014, SunTrust Bank reported it paid three wires that were presented against insufficient funds on a new SunTrust IOLTA account, leaving the account overdrawn by $65,752.69. Approximately one month later, SunTrust reported the same account was overdrawn by $18,538.42 after the bank paid two additional wires that were presented against insufficient funds.

### *Respondent's Response*

In response to the insufficient funds reports, Respondent submitted an explanation she prepared with the assistance of Asha Maurya, MHS's Chief Financial Officer for the firm's closing division. Maurya provided Respondent with the supporting documentation attached to Respondent's response. Respondent explained a real estate software upgrade made it necessary for MHS to open the new trust account at SunTrust, but several subsequent deposits were incorrectly made into the old trust account, triggering the shortfalls in the new account. In each instance, the firm's accounting department in Atlanta internally transferred the funds to the proper account, but the transfer process could not be completed until the end of the next business day.

Respondent noted that each MHS office was responsible for balancing its accounts and ensuring all funds were received and deposited prior to disbursement. Respondent explained she had followed normal procedure, but a bank error

resulted in unspecified deposits being routed to the wrong account. Respondent provided a letter from a vice president of SunTrust asserting the bank had incorrectly credited remote deposits meant for the new trust account to the old trust account. The SunTrust vice president indicated the error had been corrected and would not be a problem in the future.

Respondent also included in her response MHS's reconciliation report for the new trust account. One of the wires presented against insufficient funds was an internal wire transfer from the new SunTrust account to the old SunTrust account to cover a shortage in a client ledger. Although it is unclear why this transaction occurred, this $1,320 wire was not large enough to explain the shortfall in the new account. All of the other wires presented against insufficient funds were proper disbursements for transactions with adequate funds on deposit. Respondent was not able to identify any other misdirected deposits or provide any additional documentation of corrective measures.

### *MHS's Self-Report*

In an August 4, 2014 letter, Hardwick and Mark Wittstadt notified ODC of an unfolding investigation into MHS's trust accounts. The letter claimed Maurya admitted to Hardwick that she altered a bank statement to conceal her inadvertent transfer of nearly $690,000 from a trust account into an operating account. The letter advised (1) numerous irregular transfers between trust accounts were identified, (2) Maurya had been placed on leave, (3) a full investigation was underway, and (4) both the firm's outside counsel and outside auditing firm had been instructed to disclose all data they obtained to ODC.

### *The Trust Account Shortfalls*

The investigation by MHS and its title insurance company revealed unauthorized transfers between various MHS trust accounts and significant shortfalls in dozens of trust accounts. An early report estimated more than $29.4 million in shortages across the firm's operating and trust accounts, with the majority of the shortages occurring in trust accounts. The report estimated $648,937.40 in shortages across four South Carolina trust accounts.

After discovering funds in various trust and operating accounts had been moved and then transferred to or used for the benefit of Hardwick, the majority partners demanded Hardwick's resignation. MHS changed its name and sued Hardwick and a company he controlled. The United States Attorney's Office prosecuted both

Hardwick and Maurya.[1]  MHS's title insurance company funded $29,530,391 to cover MHS's trust account shortfalls.

After MHS filed for bankruptcy, Respondent assisted MHS in closing its South Carolina offices.  However, because of the bankruptcy, pending litigations, and pending prosecutions, both Respondent and ODC struggled to gain full access to MHS's South Carolina trust account records.

ODC's investigation revealed the explanatory letter issued by SunTrust was issued at Maurya's request and using her explanation.  The SunTrust vice president who authored the letter did not check the trust account records before writing the letter, and the explanation he offered did not match the fact that no remote deposits were ever credited to the old trust account.  Additionally, the balance report prepared by Maurya and submitted with Respondent's response to ODC was altered to conceal the fact that multiple firm ledgers and one client ledger had significant negative balances.  Respondent was unaware the document had been altered and fully cooperated with ODC.

Genuine reconciliation reports showed that, at the end of June 2014, the new SunTrust trust account had $48,170.36 less than necessary to cover client ledger balances and outstanding disbursements.  Meanwhile, comparison of MHS's internal records for the old SunTrust trust account to bank statements revealed the account had had $320,668.10 less than was needed to cover all outstanding checks and client ledger balances.  Additionally, the June 2014 reconciliation report for a South Carolina trust account Respondent was not using was short $140,060.

It appears that money was misappropriated from the accounts primarily through frequent online transfers between accounts that were recorded on firm ledgers, money was often replaced or partially replaced later, and misappropriated funds primarily left MHS via Georgia accounts.  A review of the firm's South Carolina trust account statements and available internal records revealed over $9 million in

---

[1] Initial investigations indicated Maurya redirected firm and client funds to Hardwick and to third parties for Hardwick's benefit, but federal prosecutors discovered Maurya also misappropriated more than $900,000 for her personal benefit.  Maurya pled guilty to one count of conspiracy to commit wire fraud and was sentenced to seven years' imprisonment and three years' supervised release.  Following a jury trial, Hardwick was convicted of twenty-one counts of wire fraud, one count of conspiracy to commit wire fraud, and one count of making false statements to a federally insured financial institution.  Hardwick was sentenced to fifteen years' imprisonment and six years' supervised release.  Both Maurya and Hardwick were ordered to pay restitution, jointly and severally.  Both have filed appeals.

suspicious, unexplained transfers into and out of the accounts during 2014. As noted above, MHS's title insurance company funded any identified shortfalls and ODC reports it is unaware of any South Carolina clients who were harmed.

## Law

Rule 417, SCACR, restricts access to South Carolina trust accounts in order to protect the funds contained in those accounts and those to whom the funds belong. Rule 2, Rule 417, SCACR. Only an attorney admitted to practice in South Carolina and individuals directly supervised by an attorney so admitted may have authority to sign checks or transfer funds from a client trust account. *Id.* Rule 417 also requires monthly reconciliation of all South Carolina trust accounts. Rule 1, Rule 417, SCACR. Individual ledgers must be reconciled to the firm's journal of receipts and disbursements, and the journal must be reconciled to the bank statement. *Id.* Outstanding items must be reviewed in the reconciliation process because the account must contain enough money to cover both the ledger balances and the outstanding disbursements. *Id.* The resulting reports must be carefully and skillfully reviewed, and any problems identified and addressed in order to gain the client protection envisioned by the Rule's reconciliation requirement. *Id.*

Respondent admits numerous people forbidden by Rule 417 from having access to South Carolina trust accounts had such access. *See* Rule 2, Rule 417, SCACR. Respondent failed to ensure a South Carolina licensed attorney had access to the bank statements and reconciliation reports and, instead, improperly allowed MHS accounting staff in Atlanta to transfer funds between MHS's accounts, including South Carolina trust accounts, without Respondent's direct supervision as required by Rule 417. *See* Rules 1 and 2, Rule 417, SCACR. Respondent's failure to exercise control over the South Carolina trust accounts placed South Carolina client funds at risk and allowed misappropriation of those funds. By failing to restrict access to the South Carolina trust accounts, directly supervise individuals who had access to the accounts, and ensure monthly reconciliations were not only performed, but also revealed no problems requiring her attention, Respondent violated Rule 417, SCACR. *See id.*

Respondent admits the allegations contained in the Agreement constitute grounds for discipline pursuant to Rule 7(a)(1), RLDE, Rule 413, SCACR (violating or attempting to violate the Rules of Professional Conduct).

## Conclusion

We find Respondent violated Rule 417, SCACR, and her violation constitutes grounds for discipline. Accordingly, we accept the Agreement and admonish Respondent for her misconduct.[2] We publish this admonishment in the "In re Anonymous Member of the Bar" format so as to warn members of the Bar against allowing law firm leadership or staff located outside of South Carolina to have unfettered access and control over South Carolina client funds.

**ADMONISHMENT.**

**BEATTY, C.J., KITTREDGE, HEARN, FEW and JAMES, JJ., concur.**

---

[2] In accordance with the Agreement, Respondent shall pay the costs incurred by ODC and the Commission in the investigation and prosecution of this matter or enter into a reasonable payment plan with the Commission to pay the same within thirty (30) days of the date of this opinion. Respondent shall also complete the Legal Ethics and Practice Program Ethics School and Trust Account School within one (1) year of the date of this opinion.